OPINION
Defendant-appellant Clarence (Skip) Roberts appeals his convictions and sentences in the Guernsey County Court of Common Pleas on one count of aggravated robbery, in violation of R.C.2911.01, and one count of aggravated murder, in violation of R.C.2903.01. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE
On June 30, 1997, the Guernsey County Grand Jury indicted appellant on one count of aggravated robbery, in violation of R.C.2911.01, one count of aggravated murder, in violation of R.C.2903.01, with a death penalty specification. The charges arose out of the robbery and stabbing death of Leo Sinnett on May 17, 1997. The matter proceeded to trial by jury on September 15, 1997.
The following evidence was adduced at trial.
On May 15, 1997, appellant, Albert "Chip" Andrews, John LaFollette, and Mia Willey[1] traveled to Zanesville, Ohio, in appellant's white 1986 Oldsmobile Cutlas Cierra on a "drug buy". Appellant and Andrews purchased $100 worth of crack cocaine from "a black guy in Zanesville" with money borrowed from Willey. After smoking the crack, appellant and Andrews returned to the dealer's house in order to get their money back because they were not satisfied with the quality of the drugs. The dealer refused to offer a money back guarantee and the group's discussion focused on where to obtain money to buy more drugs. Andrews stated he knew somebody the group could rob. When Andrews mentioned Leo Sinnett's name, appellant suggested foregoing the robbing of Sinnett and proceeding to kill him.
On May 17, 1997, the group reconvened at Willey's house. Appellant and Andrews left to purchase beer and cigarettes. When they returned, appellant and Andrews asked LaFollette if he wanted to go for a drive. Andrews drove appellant's vehicle; appellant sat in the front passenger's seat; and LaFollette positioned himself in the back seat. Andrews drove to 12225 Lincoln Street, Buffalo, Ohio, Sinnett's residence. Appellant and LaFollette exited the car. Andrews remained in the vehicle. LaFollette walked to the front of the house to inspect some trees he had arranged to remove for Sinnett. As appellant exited the front door of Sinnett's residence, he told LaFollette, "There's no need in talking to him, he's dead." The two returned to the vehicle and the trio left the scene.
At 6:49 p.m. on the same evening, Sergeant Brian Vierstra of the Ohio State Highway Patrol observed a white oldsmobile traveling westbound out of Buffalo on State Route 313, just past the I-77 bypass. As the vehicle approached, Sergeant Vierstra noticed the car did not have any visible front registration. When the vehicle traveled past, the officer did not observe any visible rear registration. Thereafter, Sergeant Vierstra activated his lights and pursued the vehicle, which continued westbound until the driver entered a private driveway. The driver and right front passenger exited the vehicle. The officer ordered the passenger back into the vehicle and instructed the driver to walk to the back of the car. Sergeant Vierstra observed a third male in the back seat of the vehicle.
As the officer spoke with the driver, who was identified as Andrews, Sergeant Vierstra found him to be under the influence of alcohol. When Andrews refused to submit to field sobriety tests, the officer placed him under arrest. Shortly thereafter, Trooper Stolarick arrived at the scene.
The two officers spoke with appellant, who was covered in blood from his waist to his knees. Trooper Stolarick asked appellant about the blood. Appellant informed the officers he had just processed a road kill deer. When the officers advised appellant the vehicle would be impounded, appellant told them he had a knife on his person. Sergeant Vierstra described the weapon as a four inch, double-edged knife with a black handle contained in a leather sheath.
As the officers spoke with appellant, LaFollette exited the vehicle and walked directly into a nearby residence. The officers did not observe any blood on his clothing or his person. Jim Tuttle, the owner of the house, appeared and offered to allow appellant and LaFollette to stay with him. Thereafter, Sergeant Vierstra transported Andrews to the station, while Trooper Stolarick waited for the tow truck to impound appellant's vehicle.
After leaving the scene, Trooper Stolarick contacted Deputy Masters of the Cambridge Sheriff's Department to inform the deputy he (Trooper Stolarick) was assisting that evening in overseeing the Meadowbrook High School promgoers. During their conversation, Deputy Masters received a call from his dispatcher advising of the discovery of a body. Deputy Masters and Trooper Stolarick proceeded to the Sinnett residence. Upon their arrival, the officers learned of Sinnett's stabbing death. The Trooper recalled the traffic stop he and Sergeant Vierstra made earlier that evening. Deputy Masters, Trooper Stolarick, and two other deputies did not locate anyone upon their return to the Tuttle residence.
The following day, appellant was arrested. LaFollette fled to Pennsylvania, where he was arrested approximately one month after the incident.
Special Agent Mike Kopfer of the Bureau of Criminal Identification assisted in the investigation of Sinnett's homicide. During his investigation, Agent Kopfer found blood stains on the front passenger's seat of the white oldsmobile. The agent did not observe any other blood stains in the vehicle. Margaret Saupe, a forensic scientist with the Bureau of Criminal Identification, also examined the oldsmobile and observed blood stains on the front passenger's seat. A DNA analysis of the blood sample indicated the blood was that of the victim. Saupe's analysis of Andrews' personal belongings, which were recovered during the investigation, revealed no traces of blood.
After LaFollette's arrest in Pennsylvania, he gave two taped statements to the Guernsey County Sheriff's Department. LaFollette's first statement was given to Detective Ron Pollock on June 18, 1997. The second was given to Detective Pollock and Detective John Davis on June 25, 1997.
At trial, appellant called LaFollette as a witness. Due to LaFollette's alignment with the State, the trial court permitted both parties latitude in their examinations of LaFollette. Attorney Tingle, appellant's trial counsel, attempted to impeach LaFollette with his prior statements. However, the trial court found the statements were not inconsistent with the witness' trial testimony and would not allow Attorney Tingle to make further inquiry into the statements LaFollette made to police. The statements were proffered into evidence.
After hearing all the evidence and deliberations, the jury found appellant guilty of aggravated robbery and aggravated murder. The jury did not recommend the death sentence. Via Judgment of Conviction dated October 6, 1997, the trial court memorialized the jury's verdicts. Via Judgment Entry of Sentence dated November 4, 1997, the trial court sentenced appellant to life imprisonment without parole for the offense of aggravated murder and a term of ten years for the offense of aggravated robbery. The trial court ordered the sentences to run consecutively.
It is from these convictions and sentences appellant prosecutes this appeal, raising the following assignments of error:
 I. THE COURT COMMITS PREJUDICIAL ERROR WHEN IT IMPROPERLY APPLIES RULE OF EVIDENCE 607 PROHIBITING FULL AND COMPLETE EXAMINATION, CROSS EXAMINATION AND CONFRONTATION OF WITNESSES, GUARANTEED UNDER AMENDMENT VI OF THE UNITED STATES CONSTITUTION AND THE OHIO CONSTITUTION.
 II. THE COURT MUST INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE "WHERE THE EVIDENCE PRESENTED AT TRIAL WOULD REASONABLY SUPPORT BOTH AN ACQUITTAL ON THE CRIME CHARGE AND A CONVICTION UPON THE LESSER INCLUDED OFFENSE." STATE VS. THOMAS, [SIC] (1988) 40 OHIO ST. 3D 213. [SIC] 533 N.E. 2D 286 (SYL. 2). ADDITIONALLY, IT IS PREJUDICIAL ERROR TO FAIL TO GIVE THE LESSER INCLUDED INSTRUCTION WHEN CIRCUMSTANCES, NOT CAUSED BY THE DEFENDANT REQUIRE THAT INSTRUCTION.
 III. PREJUDICIAL ERROR TO THE DEFENDANT OCCURS WHEN A JUROR FAILS TO RESPOND TRUTHFULLY TO QUESTIONS ON VOIR DIRE AND THEN COMMENTS TO JURORS DURING DELIBERATION ABOUT MATTERS OUTSIDE EVIDENCE, WHICH SAID JUROR HEARD OUTSIDE THE COURT, AND THE COURT UPON LEARNING OF POSSIBLE JURY MISCONDUCT MUST INVESTIGATE. "WHEN POSSIBLE JUROR MISCONDUCT IS BROUGHT TO THE TRIAL JUDGE'S ATTENTION HE HAS A DUTY TO INVESTIGATE AND TO DETERMINE WHETHER THERE MAY HAVE BEEN A VIOLATION OF THE SIXTH AMENDMENT" STATE V. RUDGE (1993) [SIC] 89 OHIO APP. 3D 429. [SIC] 442, 624 N.E. 2D 1069 AND STATE V. SPENCER (1997) [SIC] 118 OHIO APP.3D 871, 874. "THE TRIAL COURT SHOULD HAVE HELD AN INQUIRY OF THE PARTICULAR JUROR ACCUSED OF MISCONDUCT TO DETERMINE WHETHER APPELLANT WOULD RECEIVE A FAIR TRIAL BEFORE TWELVE IMPARTIAL JURORS." SEE STATE V. PHILLIPS (1995) [SIC] 74 OHIO ST.3D 72, 99.
Any other facts relevant to our discussion of appellant's assignments of error will be contained therein.
 I
In his first assignment of error, appellant maintains the trial court erred in finding Evid.R. 607 prohibited his full and complete examination, cross-examination and confrontation of LaFollette regarding the inconsistencies between the witness' statements to the police and his trial testimony.
Evid.R. 607 provides:
 The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Rules 801(D)(1)(a), 801(D)(2), or 803.
At trial, appellant called LaFollette as a witness. After Attorney Tingle concluded his examination of LaFollette, the trial court instructed the State to proceed with cross-examination. Attorney Tingle questioned the cross-examination, explaining LaFollette was "called as a hostile witness by the defendant". Recognizing LaFollette was closely aligned with the State, the court stated:
 This will be examination like direct examination unless he turns hostile. You both can have that right and then I'll give cross-examination to both of you. That way Judge has been perfectly fair to both sides.
Tr., Vol. XI, at 1630.
Upon completion of the State's examination, the trial court allowed appellant to cross-examine LaFollette. The State objected to appellant's attempt to impeach the witness with the statements he gave to Detectives Davis and Pollock. Appellant maintained the statements were inconsistent. After reviewing LaFollette's June 18, 1997, and June 25, 1997 statements, the trial court ruled the statements were not inconsistent with the witness' trial testimony and found appellant could not show surprise and affirmative damage as required by Evid.R. 607. The trial court instructed defense counsel to "explore other areas."
We review LaFollette's June 18, 1997 statement, June 25, 1997 statement, and his trial testimony.
On June 18, 1997, LaFollette spoke with Detective Pollock regarding Sinnett's homicide. During his statement, LaFollette detailed the events which transpired several days before the murder as follows:
 P[Detective Pollock]. Okay, alright. Now lets back up and go . . . you was in Buffalo approximately five days before all of this happened.
L[LaFollette]. Yes sir.
P. You was staying at Mia's?
L. Yes sir.
 P. Now while you was at Mia's uh . . . did anybody ever talk about going up to Leo's?
 L. No, just . . . the day before all of this happened, Jackie Dean Siddle come and asked me if I would do a tree job for him. He had already got paid for the job and that uh . . . he told me where it was at, Leo's. I said, "I know Leo, I know Sandy, I know all of them." But he asked me if I would go ahead and go look at this tree. I said, "yes, that would be fine." This was . . . this was Friday.
P. That was on Friday?
 L. I imagine it was Friday, that's the same . . . Thursday I got into a fight with Griffy Woods and Friday I went down to see Jackie Dean to what kind of . . . what he had in it because he come up with Rick and that's when he asked me if I would clean that tree up.
 P. So nobody ever said anything prior to that. Was you ever riding around in the car and it was discussed in the car, you and Mia?
L. No.
P. Nobody ever discussed going up and robbing him?
L. No.
 P. Okay, the reason I'm asking is because I got information that you guys stopped in front of the house and Skip wanted to go ahead and do him and Chip just wanted to roll him and you was in the car and never said nothing and Mia said, "no, lets go get a case of beer."
L. No.
P. You was never in the car?
L. No.
 P. So nobody ever said anything like that in front of you or around you?
L. No.
June 18, 1997 Statement at 5-6.
Approximately one week later, LaFollette spoke with Detectives Davis and Pollock. Again, the detectives asked LaFollette about the Thursday before the murder. The conversation follows:
 Pollock: Now lets back up a few days prior to that. Lets go back to Thursday.
L. Okay.
Pollock: You guys was out riding around?
L. Yeah.
Pollock: Who all was in the car?
L. It was me, Mia . . . me and Mia was in the backseat.
D[Davis]. Okay, Mia?
 L. Andrews, uh . . . Skippy was driving the car, Chip was in the passenger side of the car.
D. And you and Mia was in the backseat?
L. Yes sir.
D. Okay.
 L. Uh . . . we were cruising around and uh . . . Chip says, "well, I know somebody that `s got some money, lets go roll."
D. Okay, where was you at, at this point?
L. I believe we was in Zanesville.
* * *
Pollock: And Chip needed some money?
 L. Yeah, Chip says, "well . . ." They didn't get the right amount of stuff so they didn't have no more money. Mia wasn't giving up no more money to them. So Chip says, "well, I know of somebody that we can go roll."
D. Okay this is . . .
 L. Talking to Skip or yeah, Skippy or whatever his name is.
D. Roberts.
L. Roberts.
D. Okay, now this is Thursday, right?
L. Yeah.
D. Okay.
L. And so . . .
Pollock: What did Roberts say?
 L. He said, "to hell rolling him." He said, "we'll just kill him."
Pollock: Okay, did he say who it was?
L. No, it was never said.
June 25, 1997 Statement at 3-4.
During the State's examination of LaFollette, the following testimony was adduced:
 Q. [Assistant prosecutor]: I'd like to turn your attention to May 15, 1997, this was Thursday before Leo Sinnett was murdered. Were you introduced to [appellant] on that date?
A. Yes, sir.
* * *
Q. Prior to that date did you know [appellant]?
A. No, sir.
 Q. And were you together on May 15, 1997, with [appellant], "Chip" Andrews and Mia Willey?
A. Yes, sir.
Q. Was there a trip taken to Zanesville, Ohio?
A. Yes, sir.
 Q. And the trip was taken in [appellant's] white Oldsmobile four door vehicle, it that correct?
A. Yes, sir.
* * *
 Q. Tell the jurors your purpose in — the purpose of the trip to Zanesville.
A. "Chip" and [appellant] wanted to go get some drugs.
* * *
Q. Who asked Mia for the money?
A. [Appellant] and "Chip".
Q. How much money did they ask Mia for?
A. A hundred.
 Q. What did [appellant] say to Mia that he wanted the hundred dollars for?
A. For drugs.
Q. Did she give him a hundred dollars?
A. Yes.
Q. And did he buy drugs?
A. Yes.
 Q. Who did he buy a hundred dollars worth of crack cocaine from?
A. A black guy in Zanesville.
Q. Did he get something?
A. Yes.
Q. What happened to that something that was bought?
A. They smoked it.
Q. Who is "they" that smoked it?
A. "Chip", Mia and [appellant].
Q. Where did they smoke it?
A. Right in the car.
Q. After it was smoked was there any conversation?
 A. Yeah. They went back to the person's house, told them that it wasn't any good they wanted their money back.
Q. Who is "they"?
A. [Appellant] and "Chip".
Q. Did they get their money back?
A. No, sir.
* * *
Q. Was [appellant] upset when he came back to the car?
A. Yes, he was.
 Q. Was there a discussion at that time about Mia Willey giving more money?
 A. Yes, there was and she said she wasn't going to give him anymore money.
 Q. Tell the jurors what you recall next, Mr. LaFollette.
 A. That "Chip" Andrews said that he knew somebody that he could get that they could rob and get money from.
Q. What did [appellant] say, . . .?
 A. He was listening. He was just listening at this time. "Chip" went on to say Leo Sinnett and then that's when [appellant] said no, he says — he says we'll not rob him, just kill him.
Q. This is Thursday May 15, 1997?
A. Yes. In Zanesville.
Tr., Vol. VI, at 1631-1639.
Although the trial court did not specifically declare LaFollette to be a hostile witness, the court recognized his close alignment with the State and allowed the parties latitude in their examinations of the witness. We interpret this procedure as the trial court's treatment of the witness as hostile or, at a minimum, as if the witness had been called by the court pursuant to Evid.R. 614(A). As such, appellant's examination of the witness proceeded as if on cross.
The instant appeal calls this Court to determine whether Evid.R. 607 applies in a situation where a witness called by a party is treated as a hostile witness and/or as if called by the court. Although a strict reading of the language of Evid.R. 607 seems to indicates the rule would apply, our initial reaction is it should not apply, given the purpose of the rule. Because appellant's trial counsel was allowed to cross-examine LaFollette, thereby attacking his credibility, we find application of Evid.R. 607 to the instant action would be inconsistent with the purpose of said rule. Accordingly, the fact appellant could not show surprise and affirmative damage was an insufficient basis upon which the trial court barred appellant's use of LaFollette's statements for impeachment purposes.
LaFollette's first statement to the police on June 18, 1997, is clearly exculpatory and, obviously, inconsistent with his second statement and trial testimony. However, appellant cannot demonstrate surprise because he knew about LaFollette's second statement. Furthermore, once the trial court treated the witness as hostile and/or as if called by the court, Evid.R. 607 does not apply. The witness' June 25, 1997 statement and trial testimony are declarations against interest. In light of the second statement and trial testimony, which as declarations against interest are inherently more reliable and credible, we find the trial court's precluding appellant from impeaching LaFollette with his June 18, 1997 statement, which was inherently suspect due to its exculpatory nature, to be harmless error.
Regarding the second statement to the police, we find it is not inconsistent with LaFollette's trial testimony. At trial, LaFollette elaborated upon his June 25, 1997 statement with additional information, i.e., the name of the potential victim. In the June 25, 1997 statement, LaFollette denied appellant never mentioned Sinnett's name. In LaFollette's trial testimony, he said it was Chip (Andrews) who mentioned Sinnett's name. Additional information and/or details do not make a prior statement inconsistent. Accordingly, we find Evid.R. 607 does not apply and the trial court did not err in prohibiting appellant from impeaching LaFollette with the second statement.
Appellant's first assignment of error is overruled.
 II
In his second assignment, appellant contends the trial court erred in failing to instruct the jury on the lesser included offense of involuntarily manslaughter.
The test for whether an offense is a lesser included offense of another, R.C. 2945.74 and Crim.R 31(C), is stated in State v.Deem (1988), 40 Ohio St.3d 205, paragraph 3 of the syllabus:
 An offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense.
The Ohio Supreme Court has held involuntarily manslaughter is a lesser included offense of aggravated murder under R.C.2903.01(B) — the purposeful killing of another while committing or attempting to commit a felony. State v. Jenkins (1984),15 Ohio St.3d 164. However, a charge on the lesser offense is warranted only if the evidence adduced at trial would support it. State v. Kidder (1987),32 Ohio St.3d 279, 281.
In State v. Thomas (1988), 40 Ohio St.3d 213, the Ohio Supreme Court held:
 [E]ven though an offense may be statutorily defined as a lesser included offense of another, a charge on the lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense.
Accordingly, an instruction on the lesser included offense of involuntarily manslaughter will be given in an aggravated murder trial only when, on the evidence presented, the jury could reasonably find against the State on the element of purposefulness and still find for the State on the defendant's act of killing another. The same analysis is true of aggravated murder with prior calculation and design.
Upon review of the record, we find, under no reasonable interpretation of the evidence, could the jury have found appellant did not purposefully, or with prior calculation and design, cause the death of Leo Sinnett. The victim was stabbed 45 times, which reasonably supports a jury's finding of purposefulness. Furthermore, two days before the crime, appellant discussed killing the victim from which the jury could find appellant's actions were premeditated. Additionally, on the day of the murder, appellant carried a hunting knife on his person, which also is evidence of premeditation.
In light of the evidence, the jury could not have reasonably found against the State and for the accused upon one or more of the elements of the crime of aggravated murder, and for the State and against the accused on the remaining elements. Accordingly, we find the trial court did not err in failing to instruct the jury on the lesser included offense of involuntarily manslaughter.
Appellant's second assignment of error is overruled.
 III
In his third assignment of error, appellant asserts the trial court erred in failing to make further inquiry as to possible juror misconduct.
The Sixth Amendment and Article I, Section 5 of the Ohio Constitution guarantees that the right "to a trial by jury is designed to ensure criminal defendants a fair trial by a `panel of impartial, "indifferent" jurors.'" State v. Rudge (1993),89 Ohio App.3d 429, 442 (Citations omitted). "When possible juror misconduct is brought to the trial judge's attention he has a duty to investigate and to determine whether there may have been a violation of the Sixth Amendment." Id. "Since the trial judge is in the best position to determine the nature and extent of alleged jury misconduct, his decision on the scope of the proceedings necessary to discover misconduct is reviewed only for an abuse of discretion." Id.
During deliberations, the trial court received a correspondence from a juror requesting to speak with the judge in private. The court responded by informing the juror all communications must be writing. Thereafter, the juror sent the following communication to the trial court:
 Judge Ellwood, ne [sic] juror of the group, number 6, that's Joyce Lowe, has made two comments regarding the defendant that were not brought out in court. These comments would hold no significance as to the guilt or innocence of the defendant but we were not to discuss the case or listen to the news or anything else regarding the case or decide it outside the courtroom. We would appreciate your view on this and I can tell you the comments: Comment number 1. The juror stated Mr. Roberts has more than one child with Mia Willey not told in court. Number 2. The juror stated Mr. Roberts gets money wired from his mom not told in court. Thank you, Debbie Fettes.
Tr., Vol. VII, at 1868-1869.
In chambers, the trial court discussed with the State and appellant's trial counsel what response the parties believed to be appropriate. The State recommended the trial court indicate matters not in evidence should not be considered by the jury. The trial court asked the court reporter to type the following message:
 Thank you for your communication and concern. I admonish you to have no discussion regarding facts not raised in court. You shall decide this case based on the evidence which has been presented in court only. I appreciate that these comments are having no effect on the case but you all again are instructed not to discuss anything regarding this case that was not raised in evidence in the courtroom
Tr., Vol. VII, at 1870.
Neither the State nor appellant objected to the trial court's handling of the situation. The trial court presented the parties with an opportunity to review the note and give input as to how the court should appropriately address the situation. Given the nature of the note and the trial court's admonition to the jury, we find the trial court sufficiently handled the situation and did not err in its investigation of possible juror misconduct. Furthermore, in light of appellant's failure to object, we find no plain error.[2]
Accordingly, appellant's third assignment of error is overruled.
The convictions and sentences of the Guernsey County Court of Common Pleas are affirmed.
By: Hoffman, J., Farmer, P.J. and Wise, J. concur.
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Guernsey County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] Andrew, LaFollette, and Willey were named as co-defendants.
[2] Appellant's acquiescence in the trial court's response to the juror's note may well invoke the invited error doctrine.